# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

RICHARD FELDMANN,      )
     )
    Plaintiff,      )
     )
    vs.      )      **Case No. 4:09CV2129MLM**
     )
NEW YORK LIFE INSURANCE      )
COMPANY,      )
     )
    Defendant.      )

## MEMORANDUM OPINION

Before the court is the Motion for Summary Judgment on all Counts of the Complaint and the Motion for Summary Judgment on Counts I, III, and V of Counterclaims which Motions were filed by Defendant/Counter Plaintiff New York Life Insurance Company ("NYLIC"). Docs. 37, 39. Also before the court is the Motion for Summary Judgment on NYLIC's Counterclaims filed by Plaintiff/Counter Defendant Richard Feldmann ("Feldmann"). Doc. 43. The parties have filed Responses and Replies to the pending Motions. Docs. 54-57, 60-63. The parties have consented to the jurisdiction of the under signed United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)). Doc. 18.

## STANDARD FOR SUMMARY JUDGMENT

The court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id. See also Fenny v. Dakota, Minn. & E.R.R. Co., 327 F.3d 707, 711 (8th Cir. 2003) (holding that an issue is genuine "if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party").

A moving party always bears the burden of informing the court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of his pleading. Anderson, 477 U.S. at 256. "Factual disputes that are irrelevant or unnecessary" will not preclude summary judgment. Id. at 248.

In passing on a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. Id. at 255; Raschick v. Prudent Supply, Inc., 830 F.2d 1497, 1499 (8th Cir. 1987). The court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. However, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." Id. at 252. With these principles in mind, the court turns to an analysis of the parties' respective Motions.

### III.
### UNDISPUTED FACTS[1]

Feldmann is a multi-licensed financial advisor with certifications as a Charter Life Underwriter, Chartered Financial Consultant, and Long-Term Care Professional. On March 2, 1990, Feldmann executed an agent's contract with NYLIC, the effective date of which was March 2, 1990. Feldmann

---

[1]     The facts are undisputed unless otherwise stated.

was an agent for NYLIC in St. Louis, Missouri. There are two basic kinds of agents for NYLIC: Training Allowance Subsidy Agents, known as "TAS agents" and "Established Agents." TAS agents are considered employees of NYLIC. They are individuals who are in their first three years of the life insurance business. TAS agents receive intensive training, on-going supervision of their activities, management support of their career development, and employee benefits consistent with an employment relationship. After three years of training, NYLIC agents are classified as Established Agents. Feldmann became an Established Agent in 1993. The contract Feldmann signed with NYLIC in 1993 states, in relevant part, as follows:

> 5. Neither the "Agent" (used in this contract solely for convenience in designating one of the parties) nor anything contained in this contract or in any of the rules or regulations of the Company shall be construed as creating the relationship of employer and employee between the Company and the Agent. Subject to the provisions of this contract and within the scope of the authority granted by this contract, the Agent, as an independent contractor, shall be free to exercise the Agent's own discretion and judgment with respect to the persons from whom the Agent will solicit applications, and with respect to the time, place, method and manner of solicitation and of performance under this contract. But the Agent agrees that the Agent will not engage in conduct which will affect adversely the good standing or reputation of the Company.

> 6. The Agent hereby (a) acknowledges receipt of the "Agent's Handbook" and agrees to observe and abide by the limitations of authority and rules specified in or issued as supplements to the Handbook which apply generally to Agents of the Company; (b) agrees that the Agent's rights to receive commissions as contained in the Agent's Handbook ... .

> ...

> 9. Either the Agent or the Company may, with or without cause, terminate this contract upon written notice, said termination to become effective thirty days after the day on which such notice is dated.

NYLIC Ex. 2.

Established Agents have the freedom to set their own hours and schedules and attend about four meetings for NYLIC a year. They can work out of their own home or office space or sell

insurance from whatever location they choose. Feldmann contends that agents are required to obtain approval from NYLIC for the layout of their offices. For the last five years he was an Established Agent, Feldmann chose to sublease an office from Alexander & Associates ("Alexander"). While an agent with NYLIC, Feldmann created a sole proprietorship called Richard B. Feldmann LLC. Established Agents can chose to hire their own office staff at their own expense, without clearance from NYLIC. Feldmann's wife, Denise Feldmann ("Denise"), performed some bookkeeping for Richard B. Feldmann LLC, and was never employed by NYLIC. NYLIC Established Agents can form their own firms and partnerships to sell insurance. They pay their own office and administrative expenses. Established Agents receive no vacation pay, sick leave, or paid holidays. They are entitled to elect to receive health insurance and also receive disability insurance, life insurance, 401(k) benefits, and a pension through NYLIC.

Feldmann could not solicit business from individuals who were already customers of other NYLIC agents. While he was an Established Agent, Feldmann did sell policies of other companies. The extent to which Established Agents are restricted in their ability to sell other companies' insurance policies is disputed. NYLIC did not tell Feldmann what he had to do when he sold products of other insurance companies nor did it tell him how to deal with other companies. NYLIC Ex. 1 at 184-85. Feldmann received commissions from NYLIC based on the products he sold.

Established Agents are required to use and display NYLIC's logo and identify themselves as NYLIC agents. Feldmann attended annual and quarterly NYLIC meetings, for which NYLIC paid agents' expenses. Feldmann testified in his deposition that agents were "not suspended or anything" if they did not attend these meetings, although it was "heavily influenced." NYLIC Ex. 1 at 262-63. Feldmann paid his day-to-day expenses, including rent, payroll and self-employment tax, from the Richard B. Feldmann LLC bank account. NYLIC Facts ¶ 24. NYLIC withheld federal taxes from

4

Feldmann's compensation checks, including FICA and FUTA. Feldmann Add. Facts, ¶ 25(a). Feldmann took tax deductions for Richard B. Feldmann LLC, including advertising, car and truck expenses, commissions, fees, insurance, and legal and professional services. He filed a Schedule C of Form 1040, a profit or loss form, for Richard B. Feldmann LLC.

NYLIC has "contract maintenance requirements." Pursuant to these requirements an agent must reach the level of $18,000 for first year commissions. NYLIC Ex. 4, McCann Dep. at 41-42. Established Agents who achieve $24,000 in first-year commissions, and thus surpass NYLIC's production standard, are known as "proactive" agents. NYLIC contends that the standard production requirement and proactive status apply to everyone equally; that Established Agents must meet the specific minimum goals in order to maintain their "proactive" status; that an Established Agent who fails to satisfy the standard production requirement is placed on quarterly probation and must meet the pro rata standard production requirement set for the next year; and that a failure to meet any of the quarterly goals can result in termination of the agent's contract. NYLIC Facts, ¶¶ 30-34. Feldmann responds to these assertions that the production requirement is not part of his Agent's Contract.

In the fall of 2005, Feldmann started thinking Denise was having an affair because he saw a personal e-mail between Denise and Greg Holmgren ("Holmgren"). Holmgren worked for NYLIC since 1986 and lived in Wichita, Kansas. Denise filed for divorce in 2006. Holmgren has admitted that he had a sexual relationship with Denise. The relationship between Denise and Holmgren was consensual. Feldmann's divorce from Denise was contentious. Denise garnished Feldmann's commissions from NYLIC. Although Feldmann believes the withholdings by NYLIC pursuant to the garnishment were excessive, he agrees that NYLIC garnished income based on Orders it received from the court. Plaintiff contested the validity of the garnishments and lost in the Court of Appeals.

Feldmann's divorce was final in August 2007. Feldmann believes that his divorce was the result of an affair between Denise and Holmgren.

Sometime after Denise filed for divorce, in December 2006, Feldmann complained to Michael McCann, NYLIC Managing Partner, that Holmgren was having an affair with Denise. Feldmann contends, and NYLIC denies, that Feldmann also told McCann that he learned of other incidents between Holmgren and female agents and employees of NYLIC. NYLIC Facts, ¶¶ 50, 58. Feldmann admits that he never provided NYLIC with the names of any females who were allegedly harassed by Holmgren. NYLIC contends that no women ever complained to McCann about Holmgren. NYLIC Facts, ¶ 51. Feldmann denies NYLIC's factual assertion in this regard on the basis of his lack of knowledge. Feldmann admits that he "wasn't out to get Holmgren; [he] was asking for help." NYLIC Facts, ¶ 65. Feldmann testified in his deposition that his communications with NYLIC were "not to punish Greg. [He] was trying to get them to understand that [he] was going through a divorce after being married for 25 years. [He] was having a rough time. [He] was not out to get anybody." When asked if he provided NYLIC's human resources with the names of any females he believed Holmgren was harassing, Feldmann testified that he did not "recall. ... my main objective was not - - was to get help from them." He repeated that he was asking for help and that he knew if he had a car accident NYLIC would help him, but that because Holmgren had an affair with his wife, NYLIC was not helping him. NYLIC Ex. 1 at 111-12, 115-17.

In a memorandum, attached to an e-mail, dated December 11, 2006, McCann stated, among other things, that he spoke with Feldmann on the telephone on that same date; that Feldmann stated that there was an issue which he was "going to have to bring to [McCann's] attention but he would save that for a later time"; that Feldmann said that the issue "might end his association with" NYLIC; that McCann asked Feldmann to discuss the issue; that Feldmann said that he was in the middle of a

divorce; that Feldmann wanted to know if McCann knew any reason why Holmgren would be talking to Feldmann's wife, Denise; and that Feldmann ended the conversation with saying that "he had no proof of anything and just wanted to get [McCann's] opinion of Greg." NYLIC Ex. 8. After learning of Feldmann's allegations, NYLIC human resources interviewed both Feldmann and Holmgren, and Holmgren admitted that he had gotten close to Denise. Feldmann informed NYLIC that, due to his difficult personal situation, the divorce proceedings, he was unable to pursue new business and requested that NYLIC maintain his historical payment levels.

Feldmann states that he told Phyliss Tuminia,[2] on an unspecified date, about Holmgren's activities with Denise; that Tuminia "refused to believe that Holmgren had an affair with Denise"; and that Feldmann told Tuminia that "other agents had told him of similar activities Holmgren had pursued with other female agents." Feldmann Additional Facts, ¶ ¶ 12-13. NYLIC contends that, when Feldmann informed NYLIC of the affair between Denise and Holgrem, he wanted only to alert NYLIC to the fact that he was going through a divorce and was having a difficult time producing business. Feldman contends that he wanted NYLIC to grant him accommodations for damage Holgrem had allegedly caused him and his business and also wanted NYLIC to be aware of Holmgren's other affairs and activities. NYLIC Facts, Fedlmann Resp. ¶ 64. Feldmann was unable to accomplish anything in his business and personal life due to the distractions of his divorce.

In February, April, and June 2007 Feldmann asked NYLIC for exceptions to NYLIC's production standard. Feldmann contends that he did not receive a response to these requests. Feldmann Resp., NYLIC Facts, ¶ 68. In a February 16, 2007 e-mail to McCann, Feldmann stated that it "had been sometime since [he] informed [McCann] about the situation" with Holmgren; Feldmann

---

[2] Tuminia's position with NYLIC is not clear, although she works in NYLIC's home office.

asked if McCann had contacted Holmgren; Feldmann stated that he "believed [his] future success at NYL [was] overshadowed by the presence of Greg Holmgren"; Feldman stated that he needed "to be able to continue to receive commissions, fees, and payouts that [were] not reduced or eliminated"; he "believe[d] this treatment may be consistent with other agents/reps that [had] been through emotional and physical distress"; he stated that he had experienced uncomfortable situations dealing with Holmgren and others and that "some assurance would be necessary that this would not be a problem in the future"; Feldmann stated that his production with NYLIC had "suffered greatly" and that, due to distractions from his divorce, he was not able to accomplish anything in his personal or business life; and he asked that NYLIC allow him "to continue what [he felt] ha[d] been a successful 17 year career at NYL" and that NYLIC grant him "reasonable consideration in a few areas." NYLIC Ex. 11. These areas included "a waiver of [the production level] requirements. NYLIC Ex. 11. Also, in the February 16, 2007 e-mail, Feldmann stated that "as a last resort, [he] must consider the possibility of ending [his] relationship with" NYLIC and that he "would like to further this discussion as soon as it [was] convenient." NYLIC Ex. 11.

A memorandum, attached to an e-mail, dated February 28, 2007, prepared by someone with NYLIC "at the request of counsel," states that writer spoke with Feldmann after speaking with McCann for the purposes raised in an e-mail from Feldmann; that the writer asked Feldmann how the alleged relationship between Holmgren and Denise involved NYLIC; that Feldmann responded that he believed Holmgren used his NYLIC credit card to buy Denise meals and that they would see each other at company functions; that Feldmann said his payout on mutual funds would be "virtually cut in half"; that Feldmann requested that he be "maintained at the payment levels that he ha[d] historicallly experienced"; that Feldmann said he would have to leave NYLIC "if his income drop[ped]"; that Feldmann was uncomfortable working with Holmgren or or Holmgren's son, who

also worked for NYLIC"; that the writer asked Feldmann if he discussed the situation with other NYLIC employees; that Feldmann responded that he "spoke with two agents, who [were] close friends"; and that Feldmann would not reveal the names of the persons with whom he spoke. NYLIC Ex. 9.

In an e-mail to McCann, dated April 13, 2007, Feldmann stated that he was "completely consumed with matters that [] kept him from concentrating on business"; that McCann was aware of his concerns about production; that Feldmann "appreciated [McCann's] relaying of the message to the CP in Human Resources"; that the Human Resource person had not gotten back to him; that Feldmann felt that "they really [did not] care if [he was] severely impaired (financially) by missing the minimum requirements to run [his] business"; and that, with June 30th less than 3 months away," it was "going to be a problem." NYLIC Ex. 12.

In an e-mail, dated June 4, 2007, McCann stated that Feldmann wanted NYLIC "to grant him [certain items] in light of the personal issues he [] had to deal with over the last year or so" and that these included that his Eagle Membership not be terminated; that he be allowed to turn in new Eagle business when he ha[d] it to turn in"; that his "current payout % with NYLIFE Securities be locked thru June of 2008"; that NYLIC lock in the 4% bonus for his Life and Annuity expense allowance thru June of 2008"; and that NYLIC "give him a year of grace on not making Council this year so he can still make lifetime council in 20 years not a total of 25." NYLIC Ex. 13.

Feldmann asked McCann, in an e-mail, dated January 4, 2008, "when [his] proactive status [would] go to quarterly." This e-mail also stated that Feldmann could not "recall" if McCann had replied to Feldmann "as to what NYL [would] do for [Feldmann] going forward" and that Feldmann was "being forced in bankruptcy." NYLIC Ex. 14. In a responsive e-mail, dated January 6, 2008,

McCann stated that Feldmann was "not on quarterly probation" and that he would be on Cobra until he "hit 24k of eligible fyc this year." NYLIC Ex. 14.

By letter dated May 1, 2008, Feldmann was informed, by Phil Stokes, Assistant Vice President of NYLIC, that NYLIC was granting him "a one time extension to meet the Company's Production Standard Requirement for 2008" and that Feldmann had until December 31, 2008, to attain the minimum production amount of $18,000. NYLIC Ex. 15. In none of the aforementioned e-mails did Feldmann address any alleged relationships between Holmgren and female employees other than Denise.

In a letter to Feldmann, dated March 3, 2009, Ronald R. Bowers, Zone Agency Standards Officer for NYLIC, sated that, "as [Feldmann] was aware, [NYLIC] did extend [his] Contract Maintenance Production Standard Requirements to December 31, 2008"; that Feldmann had been "required to produce at least $18,000 in qualifying first year commissions [by that date] in order to maintain [his] agent's contract"; that Feldmann had not done so; that "as an accommodation to [Feldmann], [NYLIC []] made the decision not to terminate [his] contract for failing to meet these production standards"; that NYLIC hoped Feldmann would "become a proactive agent again [that] year"; and that NYLIC encouraged Feldmann "to work closely" with NYLIC's management "to secure assistance and support in reaching [his] production goals." NYLIC Ex. 16.

In a memo, dated May 19, 2009, Feldmann stated that, effective immediately, he was terminating his employment with NYLIC and Eagle Strategies Corp. NYLIC Ex. 18. He also stated in a memo to Eagle Strategies that Darin Alexander's threatened or impending termination from NYL/Eagle Strategies [made] it impossible for [him] to continue the joint work that Darin and [he had] built [their] practices around" and that "NYL/Eagle Strategies [was] effectively discharging [him]

because they [] made it impossible for [him] to work with them." [3] Feldmann further stated that he "appreciate[d] the fact that NYL/Eagle Strategies originally stated they would work with [him] through this ordeal, which began with an extended relationship between Greg Holmgren and [Feldmann's] ex-wife. The actual series of events that followed [] led [Feldmann] to believe that NYL's /Eagle Strategies' original intention was less than sincere." NYLIC Ex. 19.

By letter to Feldmann, dated June 1, 2009, NYLIC's Zone Agency Standards Officer Bowers stated that he wanted to emphasize that Feldmann's decision to resign was "totally voluntary" and that NYLIC was neither seeking to terminate his agent's contract or end its relationship with Feldmann. This letter further stated that the termination of Alexander's contract was "completely independent of [Feldmann's] relationship with" NYLIC. NYLIC Ex. 20.

Feldmann admits that he was not achieving the minimum production requirement to retain health insurance and that McCann advised him that his health insurance was terminated because of his lack of production. Feldmann understood that, if he was not given exceptions to the production standard, he would not meet his contract obligations. Feldmann admits NYLIC's allegation that, over the course of two years, NYLIC consented to some of his requests for exceptions to the standard production requirements. In response to this allegation, Feldmann adds that "but, [NYLIC] gave no

---

[3]     Feldmann and Darrin Alexander met approximately twelve years ago and began working together after NYLIC introduced a program wherein CPAs were licensed to sell insurance products and earn commissions. Alexander had a non-soliciting CPA contract with NYLIC which permitted him to share in commissions made through referrals to Feldmann. Alexander was a source of referral business for Feldmann. Feldmann's contract with NYLIC was completely independent of Alexander's contract with NYLIC. It is disputed whether NYLIC terminated Alexander or whether Alexander terminated his contract with NYLIC. NYLIC Facts, ¶¶ 86, 91. Feldmann does not deny that NYLIC advised Alexander of a possibility that his contract would be terminated due to lack of production. Feldmann contends, in response to this allegation, that NYLIC's "termination of his officemate, Darrin Alexander was the last straw in a series of actions by [NYLIC] constituting a constructive discharge." Feldmann's Response, NYLIC's Facts, Feldmann Resp. ¶ 91.

meaningful accommodations." NYLIC Facts, Feldmann Resp. ¶ 75. Feldmann does no know if NYLIC treated him any differently with regard to "this policy." NYLIC Facts, ¶ 77.

NYLIC contends that it did not take any specific action that made Feldmann's production go down. Feldmann responds to this allegation that NYLIC's actions in allowing Holmgren to use his position to start an affair with his wife caused his production to go down. NYLIC's Facts, Feldmann Resp. ¶ 82.

Plaintiff's charge of discrimination with the Equal Employment Opportunity Commission alleges that he was discharged by NYLIC on May 18, 2009. He cannot remember who told him he was discharged, when he was told about the discharge, or whether the notification of discharge was given to him verbally or in writing. [4]

On August 11, 2009, Feldmann filed a charge with the Equal Employment Opportunity Commission alleging "Retaliation," in that NYLIC discharged him "in retaliation for his filing a sexual harassment complaint on behalf of female employees in violation of Title VII of the Civil Rights Act of 1964." NYLIC Ex. 17.

In his Complaint, Feldmann alleges, in regard to all Counts, that "Holmgren used his position of authority and status within NYLIC to aggressively seek illicit romantic relationships with various

---

[4]     As the court finds, below, that this matter should be remanded to State court for consideration of Counts I-III of Feldmann's Complaint and for consideration of NYLIC's Counterclaims, the court need not address facts relevant to the allegations of Counts I-III and NYLIC's Counterclaims which facts are not relevant to Count IV. These facts address certain terms of Feldmann's divorce, including payment of the proceeds of Feldmann's 401k to Denise, as ordered by the State court; NYLIC's tendering an IRA rollover check, in the amount of $72,526.28 to ING, which constituted the value of Feldmann's entire 401k; and NYLIC remitting $72,526.28 to Denise, in May 2010, upon her demand. The court notes that there are issues of fact as to whether Feldmann requested that NYLIC transfer the entire $72,526.28 to ING and as to whether Feldmann has refused to return the $72,526.28 to NYLIC. The court also notes that while facts relevant to Count IV are likewise relevant to Count V, Feldmann's MHRA claim, it remains for the State court to determine whether summary judgment should be granted on Count V.

female company agents and employees, thereby creating a hostile work environment for such female agents and employees"; that, "in pursuit of these illicit relationships, Holmgren utilized NYLIC resources and his status within NYLIC, including company supplied travel, accommodations, telephone, computers, credit cards, expense accounts, seminars, meetings and other similar NYLIC properly and assets"; that "one of the objects of Holmgren's illicit advances was" Feldmann's wife, Denise; that "NYLIC knew, or should have known, of Holmgren's pattern of using company time and resources to engage in such illicit conduct, and the hostile work environment such conduct created, as well as the potential impact such behavior could and would have on NYLIC agents and employees, but chose to ignore such behavior"; that Feldman reported events relating to Holgrem's conduct with Denise and other female NYLIC agents and employees to NYLIC; that "shortly thereafter, NYLIC demoted Holmgren and transferred him to a different NYLIC region"; that as a direct and proximate result of Holmgren's and NYLIC's conduct, as described above, Feldmann's marriage was destroyed and he was unable to continue to perform under his contract with NYLIC; and that, subsequent to Feldmann's reporting the events involving Holmgren and Denise to NYLIC, NYLIC began to retaliate against Feldmann in a number of ways, including, but not limited to, withholding benefits and compensation, wrongfully withholding excessive amounts of compensation due to Feldmann in response to garnishments, and making Feldmann's work environment intolerable. Doc. 3, ¶ ¶ 3-13. Feldmann's Complaint further alleges as follows: Count I, Breach of Contract; Count II, Breach of the Covenant of Good Faith and Fair Dealing; Count III, Breach of Fiduciary Duty; Count IV, Retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e; and Count V, Retaliation under the Missouri Human Rights Act ("MHRA"), Mo. Rev. Stat. § 213.055.

In its Counterclaims against Feldmann, NYLIC alleges that, pursuant to a Decree of Dissolution, Denise was awarded 100% of Feldmann's 401k plan with NYLIC; that, in contravention

of the court's order, Feldmann requested that an IRA rollover check be issued to ING for the entire

amount of the 401k; that NYLIC did so; that NYLIC subsequently tendered the amount of the rollover

check to Denise; and that Feldmann has not refunded, to NYLIC, the amount of the IRA rollover

check. Count I of NYLIC's Counterclaims alleges Declaratory Judgment, Count II alleges Fraud,

Count III alleges Conversion, Count IV alleges Unjust Enrichment, and Count V alleges Replevin.

Doc. 22-1. This matter was originally filed in State court and NYLIC removed it to Federal Court

based on Count IV of Feldmann's Complaint alleging a violation of Title VII.

## V.
## DISCUSSION - Title VII

In Count IV, titled "Retaliation Under Title VII," Feldmann alleges that "Holmgren's and

NYLIC's actions violated Title VII of the Civil Rights Act, 42 U.S.C. § 2000e by creating a hostile

work environment for female employees and agents of NY LIFE, including [Feldmann's] former wife

who worked with and assisted [Feldmann] in carrying out [Feldmann's] duties as an agent for

NYLIC." Doc. 3, ¶ 27. Feldmann further alleges that his "reporting of those actions to NYLIC was

protected activity under Title VII." Doc. 3, ¶ 28. He contends that he was discharged in retaliation

for his engaging in this protected activity.

NYLIC argues, in support of its Motion for Summary Judgment, as to Count IV, that this

court does not have jurisdiction over Feldmann's Title VII claim because, as an independent contractor

rather than an employee of NYLIC, he is not covered by or protected under Title VII. Alternatively,

NYLIC argues that Feldmann has proffered no evidence from which a jury might reasonably infer that

any alleged protected activity was a contributing factor to any adverse employment action.

**A.** **Independent Contractor Status:**

"Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3, makes it unlawful for an

employer to discriminate against *an employee*, for among other things, 'because he has opposed any

practice made an unlawful employment practice by this subchapter.'" <u>Buettner v. Arch Coal Sales Co.</u>, 216 F.3d 707, 713 (8th Cir. 2000) (quoting 42 U.S.C. § 2000e-3). <u>See also</u> <u>Evans v. Kansas City, Mo. Schl. Dist.</u>, 65 F.3d 98, 100 (8th Cir. 1995). Title VII protects "only employees, not independent contractors." <u>Schwieger v. Farm Bureau Insurance Company of Nebraska</u>, 207 F.3d 480, 483 (8th Cir. 2000) (citing <u>Wilde v. County of Kandiyohi</u>, 15 F.3d 103, 104 (8th Cir.1994)). <u>See also Birchem v. Knights of Columbus</u>, 116 F.3d 310, 312 (8th Cir. 1997).

In <u>Schwieger</u>, the Eight Circuit held, as follows, in regard to whether an individual is an employee or an independent contractor:

> The existence of a *contract referring to a party as an independent contractor does not end the inquiry*, because an employer "may not avoid Title VII by affixing a label to a person that does not capture the substance of the employment relationship." <u>Devine v. Stone, Leyton & Gershman, P.C</u>., 100 F.3d 78, 81 (8th Cir.1996). There is "no shorthand formula or magic phrase that can be applied to find the answer," and therefore " '... all of the incidents of the relationship must be assessed and weighed with no one factor being decisive.'"

> A primary consideration is the hiring party's *right to control the manner and means by which a task is accomplished*. <u>See</u> <u>Darden</u>, 503 U.S. at 323, 112 S.Ct. 1344; <u>Berger Transfer & Storage v. Central States, S.E. & S.W. Areas Pension Fund</u>, 85 F.3d 1374, 1379 (8th Cir. 1996); <u>Wilde</u>, 15 F.3d at 105. In addition, the Supreme Court has identified twelve other factors for courts to take into account:

>> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

> <u>Darden</u>, 503 U.S. at 323-24, 112 S.Ct. 1344 (quoting <u>Reid</u>, 490 U.S. at 751-52, 109 S.Ct. 2166 and citing Restatement (Second) of Agency § 220(2) (1958)). This list is nonexhaustive, and we also weigh the "economic realities" of the worker's situation, including factors such as how the work relationship may be terminated and whether the worker receives yearly leave. <u>See</u> <u>Wilde</u>, 15 F.3d at 105. [] [T]he employee-independent contractor inquiry is fact-intensive ... <u>Berger</u>, 85 F.3d at 1377-78 ... .

207 F.3d at 483-84.

Thus, none of the above discussed factors are determinative of an individual's status. <u>Birchem</u>, 116 F.3d at 312 (holding that considerations include common law factors cited in the Restatement (Second) of Agency § 220(2) (1958) and additional factors "related to the worker's economic situation, like how the work relationship may be terminated, whether the worker receives yearly leave, whether the worker accrues retirement benefits, and whether the hiring party pays social security taxes") (citing <u>Wilde v. County of Kandiyohi</u>, 15 F.3d 103, 105 (8th Cir.1994)). Determining whether an individual is an employee or an independent contractor "requires more than simply tallying factors on each side and selecting the winner on the basis of a point score." <u>Lerohl v. Friends of Minnesota Sinfonia</u>, 322 F.3d 486, 489 (8th Cir. 2003). Rather, the relevant factors must be weighed. <u>Id.</u> (citing <u>Nationwide Mut. Ins. Co. v. Darden</u>, 503 U.S. 318, 324 (1992)).

 Indeed, the relationship between NYLIC and Feldmann was long term. NYLIC trained Feldmann, provided him with benefits, including health insurance and a 401k program, withheld federal taxes, including FICA, from Feldmann's commissions, and retained the right to terminate Feldmann's contract at-will. Likewise, NYLIC imposed certain standards to which Feldmann was required adhere in the course of his selling NYLIC's products. Additionally, NYLIC exercised some control over the manner in which Feldmann sold NYLIC's products, such as its approving the lay out of his office and requiring him to use NYLIC provided materials. These factors weigh in favor of Feldmann's being an employee of NYLIC, especially NYLIC's withholding FICA.

Nonetheless, when all relevant factors are considered, "as a whole, [] the balance tips in favor of" Feldmann's being an independent contractor. <u>Barnhart v. New York Life Ins. Co.</u>, 141 F.3d 1310, 1313 (9th Cir. 1998) (citing <u>Birchem</u>, 116 F.3d 310). The contract signed by Feldmann did contain clear and unambiguous language stating that he was an independent contractor, not an employee. To

the extent NYLIC exercised control over the manner and means by which Feldmann sold its products, control is not determinative. See Lerohl, 322 F.3d at 490 (holding that a musician was not necessarily an employee of a symphony merely because the conductor controlled rehearsals and concerts). Consistent with independent contractor status, the undisputed facts establish that Feldmann "was free to operate his business as he saw fit without day-to-day intrusions." Barnhart, 141 F.3d at 1313. In this regard, Feldmann controlled when and where he solicited business; he operated his own office, which he rented in the name of his LLC; he employed an assistant; he paid for his expenses; and he did not receive vacation pay, sick leave, or paid holidays from NYLIC. "After the first three-year term of employment [Feldmann] was paid commission only." Id. Moreover, Feldmann "admittedly sold competitor's products," although the extent to which he was permitted to do so is disputed. Id. See also Lerohl, 322 F.3d at 492 (citing Berger Transfer & Storage v. Central States, S.E. & S.W. Areas Pension Fund, 85 F.3d 1374, 1380 (8th Cir.1996) (finding owner-operators who drove trucks for more than one company were independent contractors).

Significantly, courts have held that insurance agents are independent contractors, not employees. Barnhart, 141 F.3d at 1313 (citing Birchem, 116 F.3d at 312 ("[F]ederal courts have consistently held that insurance agents are unprotected independent contractors."); Oestman v. National Farmers Union Ins. Co., 958 F.2d 303, 305-06 (10th Cir. 1992) (applying a hybrid test, but finding that an insurance agent was not an employee under the ADEA)). See also Wortham v. American Family Ins. Group, 385 F.3d 1139 (8th Cir. 2004); Knight v. United Farm Bureau Mut. Ins. Co., 950 F.2d 377 (7th Cir. 1991) (Title VII); United States EEOC v. Catholic Knights Ins. Soc'y, 915 F.Supp. 25 (N.D. Ill. 1996) (Title VII).

Having considered the relevant factors, the court finds that the undisputed facts establish that Feldmann was an independent contractor and that he was not an employee within the meaning of Title

VII. <u>See</u> <u>Lerohl</u>, 322 F.3d at 492; <u>Schwieger</u>, 207 F.3d at 483-84; <u>Birchem</u>, 116 F.3d at 312. As such, the court finds that summary judgment should be granted in NYLIC's favor in regard to Count IV of Feldmann's Complaint.

**B.     Merits of Feldmann's Title VII Claim:**

The court will, in the alternative, consider the merits of Feldmann's Title VII claim.  In particular, the court will consider whether Feldmann engaged in activity which was protected under Title VII.  "In order to make out a case of retaliation under Title VII, [a plaintiff] must show that [he] engaged in an activity protected by that act, that there was some adverse action taken against [him] ..., and that a causal connection existed between [his] participation in the protected activity and the adverse employment action." <u>Moisant v. Air Midwest, Inc.</u>, 291 F.3d 1028, 1031 (8th Cir. 2002). <u>See also</u> <u>Evans</u>, 65 F.3d at 100.  To demonstrate the presence of protected activity, a plaintiff must show a good faith reasonable belief that his employer engaged in a discriminatory employment practice. <u>Evans</u>, 65 F.3d at 100 (citing <u>Sisco v. J.S. Alberici Constr. Co.</u>, 655 F.2d 146, 150 (8th Cir. 1981); <u>Berg v. La Crosse Cooler Co.</u>, 612 F.2d 1041, 1045 (7th Cir. 1980)).  For activity to be protected under Title VII it must include "an informal or formal complaint about, or other opposition to, an employer's practice or act." <u>Jeseritz v. Potter</u>, 282 F.3d 542, 548 (8th Cir. 2002).  Feldmann contends that he allegedly complained to NYLIC regarding the alleged sexual harassment of female employees by Holmgren, including his ex-wife and that this activity is protected activity within the meaning of Title VII.

It is undisputed that Feldmann never told McCann or NYLIC's Human Resources the name of any female employee whom he thought was being harassed by Holmgren.[5]  Feldmann testified that

---

[5]     Feldmann states that after he learned of Holmgren's affair with Denies, "other agents within NYLIC told [him] of Holmgren's pursuit of similar affairs with other NYLIC female agents, employees or spouses." He also states that Penny Hardrick told him that Holmgren had

he spoke to "other people" about Holmgren; that these "other people" were not persons in NYLIC's Human Resources, they were "people [who] found out [he] was going through a divorce" and that "Greg and Denise were having an affair"; that his main objective when he spoke to Human Resources "was to get help from them"; that, when he spoke to Human Resources, "the issue [he] was trying to correct" involved Holmgren and Denise; that his communication with NYLIC was to "get them to understand that [he] was going through a divorce" and "having a very rough time"; that his communications were not to punish Holmgren and he was "not out to get anybody"; and that he did not know if he "specifically mentioned other females." NYLIC Ex. 1 at 106, 111-12, 115-17. The e-mails between Feldmann and McCann reflect that Feldmann's only concerns were his personal divorce proceedings, the need for accommodation from NYLIC so that he could meet production requirements and his continued employment with NYLIC. Feldmann's correspondence with NYLIC makes no mention of alleged sexual harassment of female employees of NYLIC. To the extent Feldmann contends that he told Tuminia about "similar activities Holmgren had pursued," Feldmann did not suggest that such activities involved anything other than consensual relationships. Moreover, the context of Feldmann's conversation with Tuminia was his complaint about the relationship between Holmgren and Denise. To the extent Feldman states that another agent told him that Holmgren had groped her, he does not suggest that he ever relayed this information to NYLIC, nor does he suggest that he ever complained specifically that any employee was being "sexually harassed" by Holmgren. The court finds, therefore, that the undisputed facts establish that "the genesis of" Feldmann's complaints was the consensual relationship between Denise and Holmgren. The court finds, therefore,

_____

groped her and that she was afraid to report this to NYLIC. Feldmann Additional Facts, ¶ 11. Feldmann does not suggest that he reported this information about Hardrick to McCann or anyone in NYLIC's Human Resources.

that the undisputed facts establish that Feldmann did not engage in activity protected under Title VII.

Moreover, to the extent Feldmann complained that Holmgren had an affair with Denise and/or NYLIC employees or spouses, as stated by the Eighth Circuit in <u>Evans</u>, "Title VII is not a 'bad acts' statute. <u>Evans</u>, 65 F.3d at 100 (citing <u>Crowley v. Prince George's County</u>, 890 F.2d 683, 687 (4th Cir.1989)). The conduct of which Feldmann complained did not concern an employment practice of either NYLIC or its employees. It cannot be said that Holmgren's consensual relationship with Denise violated Title VII by any stretch of the imagination. As such, Feldmann's complaint about the consensual relationships between Holmgren and Denise or Holmgren's consensual relationships with other employees or spouses of NYLIC employees can not have violated Title VII. <u>Curd v. Hank's Discount Fine Furniture, Inc.</u>, 272 F.3d 1039, 1041-42 (8th Cir. 2001) (citing <u>Clark County Sch. Dist. v. Breeden</u>, 532 U.S. 268 (2001) (per curiam) ("[T]o provide basis for sexual harassment retaliation claim, complaint must have been about conduct that a reasonable person could have found violated Title VII, that is, conduct that could reasonably be found to be so severe or pervasive as to alter a term or condition of employment."); <u>Folkerson v. Circus Circus Enters., Inc.</u>, 107 F.3d 754, 755-56 (9th Cir. 1997).

The court further notes that Feldmann did not suffer an adverse employment action within the meaning of Title VII. An adverse employment action is defined as a "tangible change in duties or working conditions that constituted a material employment disadvantage" or a "material change in terms or conditions of [] employment." <u>Moisant</u>, 291 F.3d at 1031 (citations omitted). Indeed, the undisputed facts establish that NYLIC accommodated Feldmann in that it did not discharge him when he failed to meet production requirements; he was given a year's extension. The undisputed facts establish, rather, that Feldmann resigned despite the accommodations made by NYLIC. Moreover,

Feldmann has failed to suggest facts to support a claim of constructive discharge, including that his working conditions became intolerable, that NYLIC forced him to quit, or that NYLIC intended to force Feldmann to resign. See Ogden v. Wax Works, Inc., 214 F.3d 999, 1007 n.13 (8th Cir. 2000); Breeding v. Arthur J. Gallagher & Co., 164 F.3d 1151, 1159 (8th Cir. 1999). To the contrary, the undisputed facts establish that NYLIC made a considerable effort to make Feldmann's working conditions tolerable in that it extended the deadlines for his reaching his production quota; that NYLIC did not force Feldmann to quit; and that it took measures to accommodate Feldmann during a difficult time in his life. As such, the court finds that the undisputed facts establish that Feldmann did not suffer an adverse employment action. Moisant, 291 F.3d at 1031.

Additionally, Feldmann suggests absolutely no evidence to establish a causal link between his alleged protected activity and his alleged discharge/constructive discharge. Significantly, Feldmann contends that he reported "Holmgren's activities" with Denise to McCann in "2005-6" and he fails to suggest the date he allegedly informed Tuminia that Holmgren had relationships with other women similar to that which he had with Denise. Feldmann Additional Facts, ¶ 12. Holmgren did not terminate his contract with NYLIC until May 2009. See Stewart v. Indep. School Dist. No. 196, 481 F3d 1034, 1044 (8th Cir. 2007) ("'[A] gap in time between the protected activity and the adverse employment action weakens an inference of retaliatory motive,' Hesse v. Avis Rent A Car Sys., Inc., 394 F.3d 624, 633 (8th Cir.2005), and [], given a delay of sufficient length, the 'causal nexus tends to evaporate.' Shanklin v. Fitzgerald, 397 F.3d 596, 604 (8th Cir. 2005)."). See also Fyfe v. City of Fort Wayne, 241 F.3d 597, 603 (7th Cir. 2001) ("In order to establish a causal connection via mere temporal proximity, the employer's adverse action must follow fairly soon after the employee's protected conduct.") (citing Hughes v. Derwinski, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (holding that four months was insufficient); Juarez v. Ameritech Mobile Commc'ns, Inc., 957 F.2d 317, 321

(7th Cir.1992) (holding that six months was insufficient). To the extent Feldmann suggests that he engaged in protected activity close to the date of his alleged discharge, "timing on its own is usually not sufficient to show that an employer's non-discriminatory reason for discharge is merely pretext." Sherman v. Runyon, 235 F.3d 406, 410 (8th Cir. 2000) (citing Stevens v. St. Louis Univ. Med. Ctr., 97 F.3d 268, 272 (8th Cir. 1996)). Feldmann has not suggested evidence to support his claim that NYLIC had a discriminatory reason for any alleged actions it took. As such, not even the timing of Feldmann's alleged discharge/constructive discharge can provide the required nexus. See Kipp v. Missouri Highway Transp. Com'n, 280 F.3d 893, 897 (8th Cir. 2002); Sherman, 235 F.3d at 410 ("The timing of a plaintiff's discharge in relation to his protected activity can sometimes establish causation for the purpose of establishing a prima facie case."). In summation, the court finds that the undisputed facts establish that Feldman did not engage in an activity protected by Title VII; that NYLIC did not take any adverse action against Feldman; and that there is no causal connection between Feldmann's participation in alleged protected activity and any alleged adverse employment action. See Moisant, 291 F.3d at 1031. As such, the court finds that summary judgment should be granted in NYLIC's favor as to Feldmann's claim, in Count IV, that NYLIC violated Title VII by retaliating against him.

Additionally, to the extent Feldmann's Complaint can be construed to allege that NYLIC's alleged failure to consent to his requests for accommodations was an adverse employment action, as argued by NYLIC, Feldmann did not allege such conduct in the charge which he filed with the EEOC; he alleged only termination and/or constructive discharge. NYLIC Ex. 17. Title VII requires a plaintiff to exhaust his administrative remedies by filing a Charge of Discrimination with the EEOC. See Shannon v. Ford Motor Co., 72 F.3d 678, 684 (8th Cir.1996) (quoting Williams v. Little Rock Mun. Water Works, 21 F.3d 218, 222 (8th Cir.1994)); Stuart v. Gen. Motors Corp., 217 F.3d 621, 630 (8th

Cir. 2000) ("It is generally recognized that '[e]xhaustion of administrative remedies is central to Title VII's statutory scheme because it provides the EEOC the first opportunity to investigate discriminatory practices and enables it to perform its roles of obtaining voluntary compliance and promoting conciliatory efforts.'").  "Before the federal courts may hear a discrimination claim, an employee must fully exhaust [his] administrative remedies." Burkett v. Glickman, 327 F.3d 658, 660 (8th Cir.2003). "Administrative remedies are exhausted by the timely filing of a charge and the receipt of a right-to-sue letter." Faibisch v. Univ. of Minn., 304 F.3d 797, 803 (8th Cir.2002).  "Because persons filing charges with the EEOC typically lack legal training, those charges must be interpreted with the utmost liberality in order not to frustrate the remedial purposes of Title VII." Cobb v. Stringer, 850 F.2d 356, 359 (8th Cir.1988).  "Accordingly, the sweep of any subsequent judicial complaint may be as broad as the scope of the EEOC investigation 'which could reasonably be expected to grow out of the charge of discrimination.'" Id. (quoting Griffin v. Carlin, 755 F.2d 1516, 1522 (11th Cir.1985)).  The Eighth Circuit has further explained:

> "Allegations outside the scope of the EEOC charge ... circumscribe the EEOC's investigatory and conciliatory role, and for that reason are not allowed." Kells v. Sinclair Buick-GMC Truck, Inc., 210 F.3d 827, 836 (8th Cir. 2000); accord Watson v. O'Neill, 365 F.3d 609, 614 (8th Cir. 2004) ("As in Williams, Watson's failure to make an assertion of retaliatory motive in relation to his non-selection as a Building Manager Specialist is fatal to his attempt to resurrect the issue."); Williams, 21 F.3d at 223 ("'Allowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumscribe the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge, as surely as would an initial failure to file a timely EEOC charge.'" (quoting Babrocky v. Jewel Food Co. & Retail Meatcutters, 773 F.2d 857, 863 (7th Cir. 1985))).

Duncan v. Delta Consol. Indus., 371 F.3d 1020, 1024 (8th Cir. 2004).

The court finds, therefore, to the extent Count IV of Feldmann's Complaint alleges that NYLIC's retaliation took the form of failure to accommodate, that Feldmann has failed to exhaust his administrative remedies. As such, the court further finds, in the alternative, that summary judgment

should be granted in NYLIC's favor to the extent Feldmann alleges that NYLIC's retaliation took the form of failure to accommodate.

## C.    Supplemental State Law Claims:

This court has original jurisdiction over Feldmann's claim under Title VII.  28 U.S.C. § 1367(c)(3) provides that a district court may decline to exercise supplemental jurisdiction where it has dismissed all claims over which it has original jurisdiction. Franklin v. Zain, 152 F.3d 783, 785 (8th Cir. 1988). When State and federal claims are alleged in a cause of action and summary judgment is granted in the defendant's favor on the federal claims, the State claims are ordinarily dismissed without prejudice to avoid needless decisions of State law, as a matter of comity. American Civil Liberties Union v. City of Florissant, 186 F.3d 1095, 1098-99 (8th Cir. 1999) (quoting Birchem, 116 F.3d at 314; Ivy v. Kimbrough, 115 F.3d 550, 553 (8th Cir. 1997)). "[F]ederal courts should exercise judicial restraint and avoid state law issues wherever possible."  Thomas v. Dickel, 213 F.3d 1023, 1026 (8th Cir. 2000).  For this reason, this court declines to exercise supplemental jurisdiction over Feldmann's and NYLIC's State law claims.  As this matter was removed to federal court from State court, the court will remand it to State court for disposition of the State law claims.

## IV.
## CONCLUSION

For the reasons discussed above the court finds that summary judgment should be granted in NYLIC's favor in regard to Count IV of Feldmann's Complaint, alleging a violation of Title VII. Additionally, the court declines to assert supplemental jurisdiction over Feldmann's remaining State law claims and NYLIC's State law counterclaims.  The court will, therefore, remand this matter to State court.

Accordingly,

**IT IS HEREBY ORDERED** that the Motion for Summary Judgment on All Counts of Feldmann's Complaint filed by NYLIC is **GRANTED**, as to Count IV; Doc. 37

**IT IS FURTHER ORDERED** that Motion for Summary Judgment on All Counts of Feldmann's Complaint filed by NYLIC is **DEFERRED** to the State court, as to Counts I-III and V, in that this court declines to exercise jurisdiction over these claims; Doc. 37

**IT IS FURTHER ORDERED** that NYLIC's Motion for Summary Judgment on its Counterclaims and Feldmann's Motion for Summary Judgment on NYLIC's Counterclaims are **DEFERRED** to the State court, in that this court declines to exercise jurisdiction over NYLIC's Counterclaims; Docs. 39, 43

**IT IS FURTHER ORDERED** that the that the Clerk of this Court shall take all appropriate administrative action to remand this case to the Circuit Court of St. Louis County, Missouri.

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE


Dated this 3rd day of February, 2011.