# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

RICHARD FELDMANN,       )
                                          )
        Plaintiff,          )
                                          )
       vs.                )     Case No. 4:09CV2129MLM
                                          )
NEW YORK LIFE INSURANCE     )
COMPANY,                    )
                                          )
        Defendant.     )

## MEMORANDUM OPINION

This court has previously granted, in part, the Motion for Summary Judgment on all Counts of the Complaint filed by Defendant New York Life Insurance Company ("NYLIC"). Doc. 64. In particular, the court granted summary judgment as to Count IV of Plaintiff Richard Feldmann's Complaint. After remanding this matter to State court for a determination of remaining claims and counterclaims, the court Ordered that the matter be returned to this court as it retained diversity jurisdiction. [1] Doc. 65. As such, pending before this court is NYLIC's Motion for Summary Judgment on all Counts of the Complaint, to the extent it seeks summary judgment on Counts I-III and V of

---

[1]      The Notice of Removal stated that this court has both federal question and diversity jurisdiction. Doc. 1. In regard to diversity jurisdiction, the Notice of removal stated that Feldmann is a resident of Missouri; that NYLIC is a foreign company with its principal place of business in New York; and that Feldmann was seeking at least $125,000 in damages, plus punitive damages. Feldmann did not seek remand. As such, the court finds that Feldmann did not dispute that he was seeking at least $125,000 in damages. Additionally, as provided by Missouri Rule 55, Feldmann did not ask for a specific amount of damages in that, in each Count, he sought damages in excess of $25,000. Where a petition does not contain a demand for specific monetary damages, a court must make a factual inquiry into this issue. Hollenbeck v. Outboard Marine Corp., 201 F.Supp.2d 990, 993 (E.D. Mo. 2001). Based on the court's independent appraisal of Feldmann's claims, it can be said that he sought damages in excess of $75,000 as required for federal diversity jurisdiction. See 28 U.S.C. § 1332.

the Complaint, and NYLIC's Motion for Summary Judgment on Counts I, III, and V of Defendant's Counterclaims. Docs. 37, 39. Also before the court is the Cross-Motion for Summary Judgment on All Counts of Defendant's Counterclaim filed by Plaintiff Richard Feldmann ("Feldmann"). Doc. 43. The parties have filed Responses and Replies to the pending Motions. Docs. 54-57, 60-63. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)). Doc. 18.

## STANDARD FOR SUMMARY JUDGMENT

The court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id. See also Fenny v. Dakota, Minn. & E.R.R. Co., 327 F.3d 707, 711 (8th Cir. 2003) (holding that an issue is genuine "if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party").

A moving party always bears the burden of informing the court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at

247. The nonmoving party may not rest upon mere allegations or denials of his pleading. <u>Anderson</u>, 477 U.S. at 256. "Factual disputes that are irrelevant or unnecessary" will not preclude summary judgment. <u>Id.</u> at 248.

In passing on a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. <u>Id.</u> at 255; <u>Raschick v. Prudent Supply, Inc.</u>, 830 F.2d 1497, 1499 (8th Cir. 1987). The court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. <u>Anderson</u>, 477 U.S. at 249. However, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." <u>Id.</u> at 252. With these principles in mind, the court turns to an analysis of the parties' respective Motions.

### III.
### UNDISPUTED FACTS[2]

Feldmann is a multi-licensed financial advisor with certifications as a Charter Life Underwriter, Chartered Financial Consultant, and Long-Term Care Professional. On March 2, 1990, Feldmann executed an agent's contract with NYLIC. Among other things, the agent's contract provided that NYLIC and Feldmann had the right to terminate the contract upon written notice. This court has found that Feldmann is an independent contractor and not an employee of NYLIC. Doc. 64.

As previously stated by this court, Feldmann's wife, Denise Feldmann worked in his office. In the fall of 2005, Feldmann started thinking Denise was having an affair because he saw a personal e-mail between Denise and Greg Holmgren ("Holmgren"). Holmgren worked for NYLIC since

---

[2]        The facts are undisputed unless otherwise stated.

1986 and lived in Wichita, Kansas. Denise filed for divorce in 2006. Holmgren has admitted that he had a sexual relationship with Denise. The relationship between Denise and Holmgren was consensual. Feldmann's divorce from Denise was contentious. Denise garnished Feldmann's commissions from NYLIC. Although Feldmann believes the withholdings by NYLIC pursuant to the garnishment were excessive, he agrees that NYLIC garnished income based on Orders it received from the court. Feldmann contested the validity of the garnishments and lost in the Court of Appeals. Feldmann's divorce was final in August 2007. Feldmann believes that his divorce was the result of an affair between Denise and Holmgren.

Sometime after Denise filed for divorce, in December 2006, Feldmann complained to Michael McCann, NYLIC Managing Partner, that Holmgren was having an affair with Denise. Feldmann contends, and NYLIC denies, that Feldmann also told McCann that he learned of other incidents between Holmgren and female agents and employees of NYLIC. NYLIC Facts, ¶¶ 50, 58. Feldmann admits that he never provided NYLIC with the names of any females who were allegedly harassed by Holmgren. NYLIC contends that no women ever complained to McCann about Holmgren. NYLIC Facts, ¶ 51. Feldmann denies NYLIC's factual assertion in this regard on the basis of his lack of knowledge. Feldmann admits that he "wasn't out to get Holmgren; [he] was asking for help." NYLIC Facts, ¶ 65. Feldmann testified in his deposition that his communications with NYLIC were "not to punish Greg. [He] was trying to get them to understand that [he] was going through a divorce after being married for 25 years. [He] was having a rough time. [He] was not out to get anybody." When asked if he provided NYLIC's human resources with the names of any females he believed Holmgren was harassing, Feldmann testified that he did not "recall. ... my main objective was not - - was to get help from them." He repeated that he was asking for help and that  he knew if he had a

car accident NYLIC would help him, but that because Holmgren had an affair with his wife, NYLIC was not helping him. NYLIC Ex. 1 at 111-12, 115-17.

In a memorandum, attached to an e-mail, dated December 11, 2006, McCann stated, among other things, that he spoke with Feldmann on the telephone on that same date; that Feldmann stated that there was an issue which he was "going to have to bring to [McCann's] attention but he would save that for a later time"; that Feldmann said that the issue "might end his association with" NYLIC; that McCann asked Feldmann to discuss the issue; that Feldmann said that he was in the middle of a divorce; that Feldmann wanted to know if McCann knew any reason why Holmgren would be talking to Feldmann's wife, Denise; and that Feldmann ended the conversation by saying that "he had no proof of anything and just wanted to get [McCann's] opinion of Greg." NYLIC Ex. 8. After learning of Feldmann's allegations, NYLIC human resources interviewed both Feldmann and Holmgren, and Holmgren admitted that he had gotten close to Denise. Feldmann informed NYLIC that, due to his difficult personal situation, the divorce proceedings, he was unable to pursue new business and requested that NYLIC maintain his historical payment levels.

Feldmann states that he told Phyliss Tuminia,[3] on an unspecified date, about Holmgren's activities with Denise; that Tuminia "refused to believe that Holmgren had an affair with Denise"; and that Feldmann told Tuminia that "other agents had told him of similar activities Holmgren had pursued with other female agents." Feldmann Additional Facts, ¶ ¶ 12-13. NYLIC contends that, when Feldmann informed NYLIC of the affair between Denise and Holmgren, he wanted only to alert NYLIC to the fact that he was going through a divorce and was having a difficult time producing

---

[3]     Tuminia's position with NYLIC is not clear, although she works in NYLIC's home office.

business. Feldman contends that he wanted NYLIC to grant him accommodations for damage Holmgren had allegedly caused him and his business and also wanted NYLIC to be aware of Holmgren's other affairs and activities. NYLIC Facts, Feldmann Resp. ¶ 64.

In February, April, and June 2007 Feldmann asked NYLIC for exceptions to NYLIC's production standard. Feldmann contends that he did not receive a response to these requests. Feldmann Resp., NYLIC Facts, ¶ 68. In a February 16, 2007 e-mail to McCann, Feldmann stated that it "had been sometime since [he] informed [McCann] about the situation" with Holmgren; Feldmann asked if McCann had contacted Holmgren; Feldmann stated that he "believed [his] future success at NYL [was] overshadowed by the presence of Greg Holmgren"; Feldman stated that he needed "to be able to continue to receive commissions, fees, and payouts that [were] not reduced or eliminated"; he "believe[d] this treatment may be consistent with other agents/reps that [had] been through emotional and physical distress"; he stated that he had experienced uncomfortable situations dealing with Holmgren and others and that "some assurance would be necessary that this would not be a problem in the future"; Feldmann stated that his production with NYLIC had "suffered greatly" and that, due to distractions from his divorce, he was not able to accomplish anything in his personal or business life; and he asked that NYLIC allow him "to continue what [he felt] ha[d] been a successful 17 year career at NYL" and that NYLIC grant him "reasonable consideration in a few areas." NYLIC Ex. 11. These areas included "a waiver of [the production level] requirements. NYLIC Ex. 11. Also, in the February 16, 2007 e-mail, Feldmann stated that "as a last resort, [he] must consider the possibility of ending [his] relationship with" NYLIC and that he "would like to further this discussion as soon as it [was] convenient." NYLIC Ex. 11.

A memorandum, attached to an e-mail, dated February 28, 2007, prepared by someone with

NYLIC "at the request of counsel," states that writer spoke with Feldmann after speaking with McCann for the purposes raised in an e-mail from Feldmann; that the writer asked Feldmann how the alleged relationship between Holmgren and Denise involved NYLIC; that Feldmann responded that he believed Holmgren used his NYLIC credit card to buy Denise meals and that they would see each other at company functions; that Feldmann said his payout on mutual funds would be "virtually cut in half"; that Feldmann requested that he be "maintained at the payment levels that he ha[d] historically experienced"; that Feldmann said he would have to leave NYLIC "if his income drop[ped]"; that Feldmann was uncomfortable working with Holmgren or Holmgren's son, who also worked for NYLIC"; that the writer asked Feldmann if he discussed the situation with other NYLIC employees; that Feldmann responded that he "spoke with two agents, who [were] close friends"; and that Feldmann would not reveal the names of the persons with whom he spoke. NYLIC Ex. 9.

In an e-mail to McCann, dated April 13, 2007, Feldmann stated that he was "completely consumed with matters that [] kept him from concentrating on business"; that McCann was aware of his concerns about production; that Feldmann "appreciated [McCann's] relaying of the message to the CP in Human Resources"; that the Human Resource person had not gotten back to him; that Feldmann felt that "they really [did not] care if [he was] severely impaired (financially) by missing the minimum requirements to run [his] business"; and that, with June 30th less than 3 months away," it was "going to be a problem." NYLIC Ex. 12.

In an e-mail, dated June 4, 2007, McCann stated that Feldmann wanted NYLIC "to grant him [certain items] in light of the personal issues he [] had to deal with over the last year or so" and that these included that his Eagle Membership not be terminated; that he be allowed to turn in new Eagle business when he ha[d] it to turn in"; that his "current payout % with NYLIFE Securities be locked

7

thru June of 2008"; that NYLIC lock in the 4% bonus for his Life and Annuity expense allowance thru June of 2008"; and that NYLIC "give him a year of grace on not making Council this year so he can still make lifetime council in 20 years not a total of 25." NYLIC Ex. 13.

Feldmann asked McCann, in an e-mail, dated January 4, 2008, "when [his] proactive status [would] go to quarterly." This e-mail also stated that Feldmann could not "recall" if McCann had replied to Feldmann "as to what NYL [would] do for [Feldmann] going forward" and that Feldmann was "being forced in bankruptcy." NYLIC Ex. 14. In a responsive e-mail, dated January 6, 2008, McCann stated that Feldmann was "not on quarterly probation" and that he would be on Cobra until he "hit 24k of eligible fyc this year." NYLIC Ex. 14.

By letter dated May 1, 2008, Feldmann was informed, by Phil Stokes, Assistant Vice President of NYLIC, that NYLIC was granting him "a one time extension to meet the Company's Production Standard Requirement for 2008" and that Feldmann had until December 31, 2008, to attain the minimum production amount of $18,000. NYLIC Ex. 15. In none of the aforementioned e-mails did Feldmann address any alleged relationships between Holmgren and female employees other than Denise.

In a letter to Feldmann, dated March 3, 2009, Ronald R. Bowers, Zone Agency Standards Officer for NYLIC, sated that, "as [Feldmann] was aware, [NYLIC] did extend [his] Contract Maintenance Production Standard Requirements to December 31, 2008"; that Feldmann had been "required to produce at least $18,000 in qualifying first year commissions [by that date] in order to maintain [his] agent's contract"; that Feldmann had not done so; that "as an accommodation to [Feldmann], [NYLIC []] made the decision not to terminate [his] contract for failing to meet these production standards"; that NYLIC hoped Feldmann would "become a proactive agent again [that]

year"; and that NYLIC encouraged Feldmann "to work closely" with NYLIC's management "to secure assistance and support in reaching [his] production goals." NYLIC Ex. 16.

In a memo, dated May 19, 2009, Feldmann stated that, effective immediately, he was terminating his employment with NYLIC and Eagle Strategies Corp. NYLIC Ex. 18. He also stated, in a memo to Eagle Strategies, that Darin Alexander's threatened or impending termination from NYL/Eagle Strategies [made] it impossible for [him] to continue the joint work that Darrin and [he had] built [their] practices around" and that "NYL/Eagle Strategies [was] effectively discharging [him] because they [] made it impossible for [him] to work with them." [4] Feldmann further stated that he "appreciate[d] the fact that NYL/Eagle Strategies originally stated they would work with [him] through this ordeal, which began with an extended relationship between Greg Holmgren and [Feldmann's] ex-wife. The actual series of events that followed [] led [Feldmann] to believe that NYL's /Eagle Strategies' original intention was less than sincere." NYLIC Ex. 19.

By letter to Feldmann, dated June 1, 2009, NYLIC's Zone Agency Standards Officer Bowers stated that he wanted to emphasize that Feldmann's decision to resign was "totally voluntary" and that NYLIC was neither seeking to terminate his agent's contract or end its relationship with

---

[4]     Feldmann and Darrin Alexander met approximately twelve years ago and began working together after NYLIC introduced a program wherein CPAs were licensed to sell insurance products and earn commissions. Alexander had a non-soliciting CPA contract with NYLIC which permitted him to share in commissions made through referrals to Feldmann. Alexander was a source of referral business for Feldmann. Feldmann's contract with NYLIC was completely independent of Alexander's contract with NYLIC. It is disputed whether NYLIC terminated Alexander or whether Alexander terminated his contract with NYLIC. NYLIC Facts, ¶¶ 86, 91. Feldmann does not deny that NYLIC advised Alexander of a possibility that his contract would be terminated due to lack of production. Feldmann contends, in response to this allegation, that NYLIC's "termination of his officemate, Darrin Alexander was the last straw in a series of actions by [NYLIC] constituting a constructive discharge." Feldmann's Response, NYLIC's Facts, Feldmann Resp. ¶ 91.

Feldmann. This letter further stated that the termination of Alexander's contract was "completely independent of [Feldmann's] relationship with" NYLIC. NYLIC Ex. 20.

Feldmann admits that he was not achieving the minimum production requirement to retain health insurance and that McCann advised him that his health insurance was terminated because of his lack of production. Feldmann understood that, if he was not given exceptions to the production standard, he would not meet his contract obligations. Feldmann admits NYLIC's allegation that, over the course of two years, NYLIC consented to some of his requests for exceptions to the standard production requirements. In response to this allegation, Feldmann adds that "but, [NYLIC] gave no meaningful accommodations." NYLIC Facts, Feldmann Resp. ¶ 75. Feldmann does not know if NYLIC treated him any differently with regard to "this policy." NYLIC Facts, ¶ 77.

NYLIC contends that it did not take any specific action that made Feldmann's production go down. Feldmann responds to this allegation by saying that NYLIC's actions in allowing Holmgren to use his position to start an affair with his wife caused his production to go down. NYLIC's Facts, Feldmann Resp. ¶ 82.

On August 11, 2009, Feldmann filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging "Retaliation," in that NYLIC discharged him "in retaliation for his filing a sexual harassment complaint on behalf of female employees in violation of Title VII of the Civil Rights Act of 1964." NYLIC Ex. 17. Feldmann's charge of discrimination with the EEOC alleges that he was discharged by NYLIC on May 18, 2009. He cannot remember who told him he was discharged, when he was told about the discharge, or whether the notification of discharge was given to him verbally or in writing.

As stated above, Feldmann and Denise were divorced in August 2007. It is undisputed that

the St. Louis County Family Court entered a Qualified Domestic Relations Order ("QDRO") awarding Denise one hundred percent of Feldmann's Agent Progress Sharing Investment ("APSI 401k"), which is a tax qualified 401k plan administered by NYLIC. Doc. 40, Ex. 5. On May 20, 2008, Feldmann singed a signed stipulation to NYLIC representing that Denise was entitled to the entire sum of his APSI 401k. Doc. 40, Ex. 2, ¶ 1, Ex. 3, ¶ 10. NYLIC contends that, in June 2009, Feldmann called NYLIC and requested that NYLIC transfer the proceeds of his APSI 401k account to his ING account and that, pursuant to this request, NYLIC did so.[5] Doc. 40, ¶ 14. Feldmann contends that when he called NYLIC regarding the transfer of funds, he requested a transfer of "new accounts, believing that NYLIC had transferred the QDRO accounts into Denise's name," and that "[a]t no time did [he] request that NYLIC transfer Denise's QDRO accounts to ING." Doc. 44, ¶ 5. On June 23, 2009, NYLIC tendered an IRA rollover check in the amount of $72,526.28, which constituted the entire amount of Feldmann's APSI 401k. On February 3, 2010, the Family Court entered an Order of Contempt against Feldmann. Doc. 40, Ex. 6. The Order of Contempt stated, among other things, that Denise had been awarded Feldmann's APSI 401k with NYLIC and that Feldmann violated the QDRO by "transferring all of his accounts from NYLIC to ING in violation of [a] Restraining Order and the QDRO." Doc. 40, Ex. 6. The Family Court also ordered Feldmann to do "all acts and things necessary to restore [Denise the NYLIC] 401k awarded to [her] that he wrongfully transferred to ING." Doc. 40, Ex. 6. NYLIC alleges that, upon Denise's demand, it remitted $72,526.28 to her in May 2010; that it has demanded that Feldmann return the money; and Feldmann has not done so. Doc. 22, ¶ ¶ 17-18. Feldmann contends "that after the transfers were made to ING, he realized NYLIC had made a mistake and transferred not only his new accounts to

---

[5]     After Feldmann no longer worked for NYLIC, he became employed by ING.

ING, but also Denise's QDRO accounts"; that he offered to transfer the amount of Denise's accounts, $72,526.28, to Denise and her attorney; that, as a result of a garnishment issued to ING, the funds were transferred to Denise and her attorney; that Feldmann advised NYLIC of the transfer in May 2010; that Feldmann no longer has the disputed $72,526.28; and that, at no time, has NYLIC demanded that Feldmann reimburse NYLIC for its mistaken transfer of Denise's QDRO accounts to Feldmann. Doc. 44, ¶ ¶ 5-8.

In his Complaint, Feldmann alleges, in regard to all Counts, that "Holmgren used his position of authority and status within NYLIC to aggressively seek illicit romantic relationships with various female company agents and employees, thereby creating a hostile work environment for such female agents and employees"; that, "in pursuit of these illicit relationships, Holmgren utilized NYLIC resources and his status within NYLIC, including company supplied travel, accommodations, telephone, computers, credit cards, expense accounts, seminars, meetings and other similar NYLIC properly and assets"; that "one of the objects of Holmgren's illicit advances was" Feldmann's wife, Denise; that "NYLIC knew, or should have known, of Holmgren's pattern of using company time and resources to engage in such illicit conduct, and the hostile work environment such conduct created, as well as the potential impact such behavior could and would have on NYLIC agents and employees, but chose to ignore such behavior"; that Feldman reported events relating to Holmgren's conduct with Denise and other female NYLIC agents and employees to NYLIC; that "shortly thereafter, NYLIC demoted Holmgren and transferred him to a different NYLIC region"; that as a direct and proximate result of Holmgren's and NYLIC's conduct, as described above, Feldmann's marriage was destroyed and he was unable to continue to perform under his contract with NYLIC; and that, subsequent to Feldmann's reporting the events involving Holmgren and Denise to NYLIC,

NYLIC began to retaliate against Feldmann in a number of ways, including, but not limited to, withholding benefits and compensation, wrongfully withholding excessive amounts of compensation due to Feldmann in response to garnishments, and making Feldmann's work environment intolerable. Doc. 3, ¶ ¶ 3-13. Feldmann's Complaint further alleges as follows: Count I, Breach of Contract; Count II, Breach of the Covenant of Good Faith and Fair Dealing; Count III, Breach of Fiduciary Duty; Count IV, Retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e; and Count V, Retaliation under the Missouri Human Rights Act ("MHRA"), Mo. Rev. Stat. § 213.055.

In its Counterclaims against Feldmann, NYLIC alleges that, pursuant to a Decree of Dissolution, Denise was awarded 100% of Feldmann's APSI 401k plan with NYLIC; that, in contravention of the court's order, Feldmann requested that an IRA rollover check be issued to ING for the entire amount of the APSI 401k; that NYLIC did so; that NYLIC subsequently tendered the amount of the rollover check to Denise; and that Feldmann has not refunded, to NYLIC, the amount of the IRA rollover check. Count I of NYLIC's Counterclaims seeks Declaratory Judgment, Count II alleges Fraud, Count III alleges Conversion, Count IV alleges Unjust Enrichment, and Count V alleges Replevin. Doc. 22-1. This matter was originally filed in State court and NYLIC removed it to Federal Court based on Count IV of Feldmann's Complaint alleging a violation of Title VII.

## V.
## DISCUSSION

### A.    Count I of Feldmann's Complaint - Breach of Contract:

Feldmann contends that he performed all of his obligations under his contract with NYLIC and that NYLIC "breached its obligations under the contract by undermining his ability to earn

13

compensation and benefits by allowing Holmgren to abuse his position of trust and authority with NYLIC and to use NYLIC's resources to pursue illicit romantic relationships with female employees of NYLIC and create thereby a hostile work environment throughout the West Central Zone, including [Feldmann's] former wife, Denise Feldmann." Doc. 3, ¶ 16.  Feldmann alleges that, as a result of NYLIC's conduct he suffered damages in excess of $25,000.

Under Missouri law, a breach of contract claim requires the following elements: (1) the existence of an enforceable contract between the parties; (2) mutual obligations arising under the terms of the contract; (3) one party's failure to perform the obligations arising under the terms of the contract; and (4) damages. Lakeridge Enters. Inc. v. Knox, 311 S.W.3d 268, 271 (Mo. Ct. App. 2010).  First, this court has previously found that the undisputed facts establish that NYLIC did not terminate Feldmann; that Feldmann was not constructively discharged by NYLIC; and that Feldmann resigned his position as an agent with NYLIC.  Under such circumstances, the court finds, therefore, that the undisputed facts establish that NYLIC did not breach the contract it had with Feldmann by terminating or constructively discharging him. Second, to the extent it has not explicitly stated in its prior Memorandum Opinion, the court further finds that the undisputed facts establish that NYLIC did not create a hostile work environment; that it did not threaten to terminate Feldmann; and that NYLIC took extraordinary measures to accommodate Feldmann during a difficult period in his life. Most significantly, as previously found by this court, the undisputed facts establish that the affair between Denise and Holmgren was consensual.  Moreover, the undisputed facts establish that Feldmann never provided anyone in authority at NYLIC the names of other women with whom Feldmann allegedly had affairs.  To the extent Feldmann told McCann about Holmgren's conduct, Feldmann acknowledged that he told McCann that the relationships were similar to that between

14

Holmgren and Denise; thus, they were consensual. The court finds, therefore, that the undisputed facts establish that NYLIC did not fail to perform any obligation arising under the terms of the contract; that Feldmann was not damaged as a result of any conduct on the part of NYLIC; and that, therefore, NYLIC did not breach its contract with Feldmann. See Lakeridge, 311 S.W.3d at 271. As such, the court finds that summary judgment should be granted in NYLIC's favor as to Count I of Feldmann's Complaint.

**B.      Count II - Breach of Covenant of Good Faith and Fair Dealing:**

Feldmann contends that the contract between himself and NYLIC implied a covenant of good faith and fair dealing; that NYLIC breached this covenant "by allowing Holmgren to abuse his position of trust and authority and the resources of NYLIC to pursue illicit romantic relationships with various female employees and agents of NYLIC and to create a hostile work environment throughout the West Central Zone, including [Feldmann's] former wife, Denise Feldmann." Feldmann contends that, as a result of this conduct, he suffered damages in excess of $25,000.

Missouri law implies a covenant of good faith and fair dealing in every contract. Farmers' Elec. Coop. Inc. v. Missouri Dep't of Corrections, 977 S.W.2d 266, 271 (Mo 1998). As explained by the Eighth Circuit in Comprehensive Care Corp. v. RehabCare Corp., 98 F.3d 1063, 1066 (8th Cir. 1996):

> The law does not allow the implied covenant of good faith and fair dealing to be an everflowing cornucopia of wished-for legal duties; indeed, the covenant cannot give rise to new obligations not otherwise contained in a contract's express terms. Glass v. Mancuso, 444 S.W.2d 467, 478 (Mo.1969). The implied covenant simply prohibits one party from "depriv[ing] the other party of its expected benefits under the contract." Morton v. Hearst Corp., 779 S.W.2d 268, 273 (Mo. Ct. App. 1989) (citing Martin v. Prier Brass Mfg. Co., 710 S.W.2d 466, 473 (Mo. Ct. App.1986)); see also American Business Interiors, Inc. v. Haworth, Inc., 798 F.2d 1135, 1142 (8th Cir.1986) ("Each party must do nothing destructive of the other party's right to enjoy

the fruits of the contract and do everything the contract presupposes they will do to accomplish its purpose.").

... The implied covenant of good faith and fair dealing [however] "does not transform a business relationship into a fiduciary relationship." W.K.T. Distrib. Co. v. Sharp Elecs. Corp., 746 F.2d 1333, 1337 (8th Cir.1984) (citing Bain v. Champlin Petroleum Co., 692 F.2d 43, 47 (8th Cir.1982)).

Further, to establish a breach of the duty of good faith and fair dealing "it is not enough for a plaintiff to show that a party invested with discretion made an erroneous decision." BJC Health Sys. v. Columbia Cas. Co., 478 F.3d 908, 914 (8th Cir. 2007) (citing Mo. Consol. Health Care Plan v. Cmty. Health Plan, 81 S.W.3d 34, 46 (Mo. Ct. App. 2002)). "Instead, the plaintiff must show that the party exercised its discretion 'in such a manner as to evade the spirit of the transaction or so as to deny [the other party] the expected benefit of the contract.'" Id. (citing Mo. Consol. Health, 81 S.W.3d at 48).

As discussed above and in the court's previous Memorandum Opinion, (Doc. 64), the undisputed facts establish that NYLIC took extraordinary measures to accommodate Feldmann during a difficult time in his life; that Feldmann terminated his contract with NYLIC; and that NYLIC did not discharge or constructively discharge Feldmann. As such, the court finds that the undisputed facts establish that NYLIC did not evade the spirit of its contract with Feldmann and that it did not act in a manner so as to deny Feldmann the expected benefit of the contract. See BJC, 478 F.3d at 914; Comprehensive Care, 98 F.3d at 1066. The court finds, therefore, that summary judgment should be granted in NYLIC's favor as to Count II of Feldmann's Complaint.

## C.     Count III - Breach of Fiduciary Duty:

In support of his claim of Breach of Fiduciary Duty, Feldmann alleges that the relationship between himself and NYLIC was one of agent and principal; that, therefore, NYLIC owed him

certain fiduciary duties; that these duties included providing him with a work environment in which he could perform his duties without unreasonable interference by other employees of NYLIC and "free from interference and intentional conduct harmful by other NYLIC agents and employees"; that NYLIC breached its fiduciary obligations to Feldmann "by allowing Holmgren to use his position of trust and authority and resources of NYLIC to pursue illicit romantic relationships with female employees and agents, including [Feldmann's] former wife"; and that, as a result of NYLIC's conduct, Feldmann suffered damages in excess of $25,000.

As stated by the Missouri appellate court in Gilbreath v. First State Bank of Joplin, 859 S.W.2d 237, 238 (Mo. Ct. App. 1993), to establish a prima facie case of a breach of fiduciary duty, a plaintiff must prove:

> (1) as between the parties, one must be subservient to the dominant mind and will of the other as a result of age, state of health, illiteracy, mental disability, or ignorance; (2) things of value such as land, monies, a business, or other things of value which are the property of the subservient person must be possessed or managed by the dominant party; (3) there must be a surrender of independence by the subservient party to the dominant party; (4) there must be an automatic or habitual manipulation of the actions of the subservient party by the dominant party; and (5) there must be a showing that the subservient party places a trust and confidence in the dominant party.

The mere existence of a business relationship between Feldmann and NYLIC did not create a fiduciary duty. Chmieleski v. City Prods. Corp., 660 S.W.2d 275, 295 (Mo. Ct. App. 1983). Moreover, the contract between Feldmann and NYLIC gave them each the authority to terminate their relationship at will. Further, the as previously found by this court, Feldmann was an independent contractor who managed his own business. Additionally, the undisputed facts establish that Feldmann exercised independent judgment and discretion regarding the solicitation of business and the time, place, and solicitation of business. He was not subservient to NYLIC in terms of health, literacy,

ignorance, mental disability, or, for that matter, knowledge. As such, it cannot be said that NYLIC was dominant or that Feldmann was subservient. Although the contract created an interdependent relationship between NYLIC and Feldmann, there is nothing in the contract which describes Feldmann as reposing any trust in NYLIC within the meaning of a fiduciary relationship. See id. Moreover, Feldmann cites no authority for a finding that the relationship between an insurance agent and an insurance company is fiduciary. Most significantly, as previously found by this court, NYLIC took extraordinary measures to help Feldmann during a difficult time in his life. The court finds, therefore, that the undisputed facts establish that NYLIC did not have a fiduciary duty to Feldmann and, alternatively, that it did not breach any alleged fiduciary duty to Feldmann. As such, the court further finds that summary judgment should be granted in NYLIC's favor as to Count III of Feldmann's Complaint.

**D.      Count V - MHRA:**

In Count V, Feldmann alleges that NYLIC violated the MHRA, Mo. Rev. Stat. § 213.055, by creating a hostile work environment for female employees and agents of NYLIC, including Feldmann's former wife. Feldmann further alleges that his reporting these actions to NYLIC was protected activity under the MHRA and that NYLIC retaliated against him for reporting NYLIC's actions. In Count V, Feldmann incorporates by reference all preceding Counts, including the allegations of Count IV, alleging retaliation in violation of Title VII, 42 U.S.C. § 2000e.

Absent an exception that is not applicable to the pending Motions, the standards governing Title VII actions are the same standards which should be employed in determining the merit of claims

brought pursuant to the MHRA.[6] See Buettner v. Arch Coal Sales Co., Inc., 216 F.3d 707, 715 (8th Cir. 2000); Smith v. St. Louis Univ., 109 F.3d 1261, 1264 n.2 (8th Cir. 1997); Tart v. Hill Behan Lumber Co., 31 F.2d 668, 671 (8th Cir. 1994).   As previously stated by this court, to establish a violation of Title VII, a plaintiff must first establish that he is an employee.   Likewise, a plaintiff alleging a violation of the MHRA must establish that he was an employee.   This court has previously held that the undisputed facts establish that Feldmann was not an employee of NYLIC; rather, he was an independent contractor. Doc. 64 at 15-18.   As further found by this court, the undisputed facts establish that Feldmann did not engage in protected activity as required for a violation of Title VII. Doc. 64 at 18-20.   Likewise, the MHRA requires that a plaintiff engaged in protected activity. Daugherty v. City of Maryland Heights, 231 S.W.3d 814, 819 (Mo. 2007) (en banc). Therefore, for the reasons discussed in the court's previous Memorandum Opinion in regard to Feldmann's claims of discrimination in violation of Title VII, the court finds that the undisputed facts establish that Feldmann's allegation that NYLIC violated the MHRA is without merit and that summary judgment should be granted in NYLIC's favor as to Count V of Feldmann's Complaint.

E.     **NYLIC's Counterclaims:**

28 U.S.C. § 1332(a) provides, in relevant part, that where a party invokes federal jurisdiction based on diversity of citizenship, district courts "shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs."   Federal jurisdiction must be presented by a plaintiff's complaint "as it stands at the time the petition for removal is filed and the case seeks entry into the federal system.   It is insufficient that

_____

[6]     To ultimately prevail on a claim under the MHRA a plaintiff need only prove that unlawful motivation was a "contributing factor" in an employment decision. Daugherty v. City of Maryland Heights, 231 S.W.3d 814, 818-19 (Mo. 2007) (en banc).

19

[federal jurisdiction is] raised as a matter of defense or as a counterclaim." 14A Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d §3722, pp. 255-260 (1985). At the time this matter was removed, the court had federal question jurisdiction based on Feldmann's Title VII claim. Additionally, at the time of removal, based on the allegations of Feldmann's Complaint, complete diversity existed and the required jurisdictional amount of $75,000 was met. See n.1. The court finds that summary judgment should be granted in regard to all claims made in Feldmann's Complaint and that it has jurisdiction to consider NYLIC's Counterclaims.

The court further finds that there are genuine issues of material fact relevant to all Counterclaims, including, but not limited to, whether Feldmann requested a rollover check for the entire amount of his APSI 401k account; whether NYLIC requested that Feldmann repay the $72,526.28; and whether Feldmann has retained the $72,526.28. As such, the court finds that NYLIC's Motion for Summary Judgment on Counts I, III, and V [7] of Counterclaims and Feldmann's Motion for Summary Judgment on All Counts of NYLIC's Counterclaims should be denied.

## CONCLUSION

For the reasons more fully set out above, the court finds that summary judgment should be granted in NYLIC's favor as to Counts I-III and V of Feldmann's Complaint. As such, summary judgment will have been granted in NYLIC's favor in regard to all Counts of Feldmann's Complaint. Additionally, the court finds that NYLIC's Motion for Summary Judgment on Counts I, III, and V of Counterclaims and Feldmann's Motion for Summary Judgment on All Counts of Counterclaims should be denied.

---

[7] NYLIC did not move for Summary Judgment on Counts II and IV of its Counterclaims.

Accordingly,

**IT IS HEREBY ORDERED** that NYLIC's Motion for Summary Judgment on All Counts of the Complaint is **GRANTED,** as to Counts I-III and V, of the Complaint; Docs. 3, 37

**IT IS FURTHER ORDERED** that the NYLIC's Motion for Summary Judgment on Counts I, III, and V of Counterclaims and Feldmann's Motion for Summary Judgment on All Counts of Counterclaim are **DENIED**; Docs. 39, 43.

**IT IS FURTHER ORDERED** that at the end of proceedings in this matter a judgment shall issue which reflects that NYLIC's Motion for Summary Judgment on All Counts of the Complaint has been granted, in its entirety, in NYLIC's favor.

> /s/Mary Ann L. Medler
> MARY ANN L. MEDLER
> UNITED STATES MAGISTRATE JUDGE

Dated this <u>17th</u> day of  February, 2011.